**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Susan Bender,** | ) | **CASE NO. 1:17 CV 1960** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **CommutAir Division of Champlain Enterprises LLC,** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendant.** | ) | |

## Introduction

This matter is before the Court upon defendant's Motion for Summary Judgment (Doc. 27). This case arises out of the termination of plaintiff's employment with defendant. For the following reasons, the motion is GRANTED.

## Facts

Plaintiff Susan Bender filed her Complaint against defendant CommutAir Division of Champlain Enterprises LLC (CommutAir or defendant). Defendant removed the case to this Court on the basis of diversity of citizenship. According to plaintiff's Complaint, she was employed by defendant as a technical publications editor from September 2015 until her

1

termination on February 1, 2017. Plaintiff alleges that she was terminated after making a formal safety related complaint to the human resources department about her supervisor, Joan Callahan, on December 14, 2016. The Complaint alleges one claim for violation of Ohio public policy; namely, the violation of 14 C.F.R. 121.135.

The evidence submitted to the Court presents the following facts. CommutAir is a regional airline partner for United Airlines that operates aircrafts in the eastern region of the United States. During the relevant times, Justin Conrad was Vice President and Director of Operations. He oversaw the Technical Publications department (Tech Pubs). Jake Lofting was the Assistant Director of Operations who also oversaw Tech Pubs. Both Conrad and Lofting are licensed pilots.

Conrad testified at deposition that technical writers in the Tech Pubs department "do the word processing portion" of the aircraft operation manual (AOM). Plaintiff was hired by defendant as a technical writer in Tech Pubs on September 21, 2015. Within a month, Joan Callahan was promoted to manager of the department. According to plaintiff's deposition testimony, Callahan had worked in airplane maintenance and did some technical writing on maintenance documents. Plaintiff also testified that beginning about October 2015, plaintiff complained to Conrad and Lofting that she was not getting the training that she felt she needed and that Callahan was giving her "on numerous occasions, like the wrong revision, the wrong chapters, outdated information." But, plaintiff felt that Conrad and Lofting "always defended" Callahan and indicated "we don't think she is doing it on purpose."

Plaintiff sent emails to Lofting and Conrad between April and July 2016 which expressed further complaints about Callahan. The emails discussed that Callahan's lack of knowledge was

causing extra work for plaintiff, that Callahan was not doing sufficient training, that Callahan was not giving plaintiff certain files, and that Callahan did not give her credit for the work she did. When asked at deposition about the emails, plaintiff testified that she believed that Callahan's lack of knowledge with the FrameMaker software caused Callahan to "mess up" plaintiff's files, and that Callahan would work on the files herself, mess them up, and hide them which prevented plaintiff from doing her job.

Marko Nenadovic and Dorjan Scott were also technical writers in the Tech Pubs department. According to Nenadovic, within a week or so of beginning work in July 2016, plaintiff told him that they could not trust Callahan and that Callahan sabotages their work, takes credit for their work, messes up their files due to her lack of knowledge of the software, and keeps important things from them so that they fail. When plaintiff's negative talk continued, Nenadovic told Callahan in September 2016, of plaintiff's comments. According to Denise Daniels (Human Resources Manager), this precipitated a meeting she held at that time with Callahan, Conrad, and Lofting wherein it was discussed how the relationship between plaintiff and Callahan could be repaired.

Plaintiff received a positive Performance Evaluation Report from Callahan in early October 2016. She received high marks for the quality of her work and her work habits. It was also noted that she is "very pleasant and happy to help others." Callahan listed "some of the many accomplishments" plaintiff achieved. Plaintiff, herself, noted on the report that it "has been a pleasure working in this Department" and that "Joan Callahan is amazing, very bright and talented."

In an email exchange on November 8, 2016, plaintiff disagreed with Callahan's new

3

directive for a quality control measure in Tech Pubs. Callahan wrote in the email to Tech Pubs that, going forward, "For any manual revision or temporary revision, let's implement the attached document as a Quality Checklist for Tech Pubs.  You can pick from myself, Susan, Dorjan, or Marko to double check the document you are working on when you have finished your changes but before it makes it back to the SME [Subject Matter Expert]." Plaintiff immediately responded by email that the new measure would add extra time and make the process more cumbersome, and questioned the propriety of having an additional worker do a review "since the person who worked on the file is very familiar with the comments and changes they made to the file, but the additional person isn't."  Callahan responded by email that "having a fresh set of eyes on the documents is very beneficial." Plaintiff persisted and responded by email that Callahan did not realize how much work was involved in the employees' projects and stated, "We can try it, but the SME's will have to wait longer for their files.  Do you think they will like that ??"

On December 8, 2016, plaintiff sent Lofting and Conrad an email entitled "Suggestion." She stated, "I have a little suggestion.  It would really be a good idea to have more documented procedures especially for Tech Pubs... most companies find documenting their procedures very helpful."  Plaintiff stated in the email that she had not been trained on Change Bars and Jepps Chart.  She wrote that another employee in the department had not been trained on TRs.  She further stated that she had to revise a FrameMaker template that day while she was printing a manual "and discovering that the printer needed cleaned and was jamming."  Plaintiff testified at deposition that Callahan would not get the printer fixed and she wanted plaintiff to change the FrameMaker template at the point of printing which "isn't the best time to change a template

4

because it could have repercussions..." Plaintiff believed Callahan was retaliating against her by not getting the printer fixed and changing the template at the point of printing.

On December 14, 2016, plaintiff wrote a six page email to David Hewitt (Employee Relations Manager), Conrad, and Lofting. The email states that Callahan "has not provided any or very little training on many tasks that we need to perform." Plaintiff wrote that since she first started working there, Callahan gave her "many wrong files or versions of files on many occasions to work on... From that time on, I have not trusted her to give me accurate information and files, so I double-check everything with the subject matter experts." Plaintiff also stated that Callahan "is being a little competitive with me and the other technical writer in Tech Pubs because all of us have over 20 years more technical writing experience than she has." The email included pages of "examples of why I have the impression " that Callahan is "a little competitive with me." She describes an incident wherein plaintiff had to print copies of the manual and discovered that "the printer was printing black streaks all over the manuals." Plaintiff showed it to Callahan who told her to print them like that. Callahan arranged for the printer to be repaired only after plaintiff informed Conrad and Lofting of the issue. Another example involved the fact that although there was no set way to handle Change Bars, Callahan did not document the latest procedure as plaintiff had asked her to do.

The December 14 email resulted in a meeting the next day with plaintiff, Hewitt, and Conrad. Plaintiff testified that she said at the meeting that Callahan was competing to make herself look better than everybody, but that Hewitt told plaintiff that if Callahan, "as your manager, tells you to print manuals, you need to print them like that." Hewitt and Conrad both testified that they told plaintiff at the meeting that Callahan was the manager and plaintiff needed

to follow her directives.

On December 19, 2016, plaintiff sent an email to Laura Prince (Managing Director of Human Resources) stating that she was very bothered that Hewitt said that if Callahan told her to print the manuals with the black bars, she should do as Callahan instructed. When asked about the email, plaintiff testified that she wrote the email because she knew Callahan was retaliating against her, but that she only printed three pages of the manual before the printer was fixed.

Hewitt testified that on January 4 and 5, 2017, he spoke with Nenadovic and Nick Wolf (a graphic designer whose workstation was located in the Tech Pubs department) about things that Callahan had told him that plaintiff said about her. Nenadovic and Wolf stated in their declarations that when questioned by Hewitt, they told him that plaintiff had been talking negatively about Callahan.

Plaintiff sent another lengthy email to Prince and Denise Daniels (Human Resource Manager) on January 4, 2017, addressing the Change Bar issue. The email stated that Callahan's lack of knowledge in the FrameMaker software had caused "a lot of rework- double work for everybody" and that Callahan was blaming plaintiff for the errors. According to Daniels's declaration, a meeting was held the next day, January 5, with plaintiff, Daniels, and Prince. Daniels took contemporaneous handwritten notes which are attached to her declaration. Prince testified that at the meeting, plaintiff told her that she could not work for Callahan and requested a layoff. Prince told plaintiff that she could not be laid off because someone was needed to do the job, and that she could quit with a mutual agreement. Plaintiff testified that at the meeting, she was told that Callahan was the manager and she would remain so. Plaintiff testified that as a result, she told Prince that "why don't we just end this peacefully?" She told them that she

6

would "volunteer to get laid off."

Prince wrote plaintiff an email on January 6, 2017 stating, "As we have discussed, your employment with our Company will terminate at the close of business on January 9, 2017 due to mutual agreement." On Saturday, January 7, 2017, plaintiff responded to Prince by email: "I gave it some thought over the weekend and I haven't decided that I want to quit the job at CommutAir. I requested from you and Denise last week that I have time to consult with my attorney for him to review the letter. He won't be available for me to meet with him until this coming week after Monday. I plan on coming in to work on Monday morning at my scheduled time..." Plaintiff returned to work and on January 11, 2017, she was presented a Record of Instruction and Action which states that plaintiff may return from administrative leave effective January 12 but that due to recent reports of insubordination towards her manager, plaintiff must "refrain from disparaging remarks about her supervisor both within her department as well as outside of her department and ensure that she follows the instructions of her supervisor." Plaintiff was given notice that failure to do so could result in termination. Plaintiff signed the document, but sent a letter to Prince that day stating, "In my view, the letter given to me is retaliatory because I accused my boss Joan Callahan of what amounts to neglect of duty."

On January 19, 2017, plaintiff wrote an email to defendant's Director of Safety John Darke, Conrad, and Lofting entitled "Possible Safety Concern." Plaintiff stated in the email that Callahan had previously "requested a way" to remove Change Bars, but that plaintiff had found a "correct and safe way to add/delete single change bars from FrameMaker files." Plaintiff states that she informed everyone of her method but that they did not use it. Plaintiff enclosed a video she made. Callahan testified that she had plaintiff's co-workers view the video, but they

7

concluded they would not use the method because it involved "15 extra steps" to remove Change Bars.

Prince states in her declaration that on January 30, 2017, she had a normal weekly meeting with Josephine Monyak, defendant's Corporate Communications Specialist, who reported that plaintiff was making certain statements. Upon Prince's request, Monyak sent her an email detailing the information:

> On Monday, January 30, 2017, just before 9:00 A.M. Susan Bender came to me and asked if I had been speaking to Laura (Prince) about her relationship with Joan. I told her that I had not, and that the tech pubs issues aren't really any of my business. She proceeded to tell me that she likes Joan as a person, but not as a boss. She stated that she has 30 years more experience that (sic) Joan, and Joan had not trained her properly; that is why she argues with her. I responded by repeating that because I work for Corp Comm, I am really my own little island and I try to stay out of tech pub's business.

Prince testified that she considered plaintiff's statements to Monyak to be "just maligning Joan" because Monyak was a communications person who did not work in plaintiff's department and plaintiff would not have had "any reason to talk ... about how bad of a boss Joan was." Plaintiff avers in her affidavit that Monyak's email statements are hearsay and false.

On January 30, Prince asked Nenadovic whether plaintiff's behavior was continuing. Nendovic told Prince that plaintiff's complaints about Callahan had increased in intensity in the last few weeks. At Prince's request, Nenadovic wrote an email on February 1, 2017, which stated that plaintiff told him that Callahan "bugged" his area and has been monitoring his conversations with plaintiff; Callahan hacked into his laptop to try to corrupt or sabotage his files; Callahan has been deliberately giving them misinformation to make them look bad so that she can fix the mistakes and take the credit; Callahan is a brat and does not know anything about manuals or leadership; plaintiff has extensive experience and does not need any direction from a

8

'Little Brat' with no experience; and Callahan wants to get the workers fired or in trouble. Nenadovic also stated that plaintiff accused him and Wolf of sabotaging the printer so that it would jam on her.

Upon confirming that plaintiff's behavior was continuing, Prince testified that she made the decision to terminate plaintiff for insubordination, i.e., continuing to make derogatory remarks about her supervisor. On February 1, 2017, Daniels and Prince met with plaintiff. Prince informed plaintiff, in writing, on that date that her employment had been terminated because she had signed the Record of Instruction and Action stating that she would refrain from disparaging remarks about her supervisor within her department but she had continued to do so.

Plaintiff thereafter filed this Complaint setting forth a claim that she was terminated in violation of Ohio public policy. This matter is now before the Court upon defendant's Motion for Summary Judgment.

**Standard of Review**

Summary Judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)); *see also LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits," if any, which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (citing Fed. R. Civ. P. 56(c)). A fact is "material only if its resolution

will affect the outcome of the lawsuit." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir.1993). The nonmoving party may not simply rely on its pleading, but must "produce evidence that results in a conflict of material fact to be solved by a jury." *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

Summary judgment should be granted if a party who bears the burden of proof at trial does not establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). Moreover, if the evidence is "merely colorable" and not "significantly probative," the court may decide the legal issue and grant summary judgment. *Anderson*, 477 U.S. at 249-50 (citation omitted).

**Discussion**

In support of her claim for wrongful termination in violation of public policy, plaintiff cites to 14 C.F.R. § 121.135. That federal regulation, entitled "Manual contents," relates to the preparing and maintenance of manuals "for the use and guidance of flight, ground operations, and management personnel" for certificate holders such as defendant. The regulation has three

10

subsections.  Subsection (a) lists four requirements that each manual must have; subsection (b) identifies all the information that each of the parts of a manual must contain; and subsection (c) states that each certificate holder must maintain at least one copy of the manual at its principle base of operations.  In her Complaint, plaintiff alleges that she made a formal complaint to the human resources department on December 14, 2016, about Callahan engaging in technical manual editing practices that could cause an aircrew safety incident. In her brief, she asserts that she raised safety complaints about Callahan in her December 14, 2016, December 19, 2016, and January 19, 2017 emails.

The parties agree that to establish a claim for wrongful termination in violation of public policy in Ohio, the claimant must prove the following, 1) that a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); 2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); 3) that the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and 4) that the employer lacked an overriding legitimate business justification for the dismissal (the overriding justification element). *Collins v. Rizkana*, 73 Ohio St.3d 65, 652 (1995).  See also *O'Connor v. Nationwide Children's Hospital*, 723 Fed.Appx. 321 (6th Cir. 2018) (citing *Collins*). The clarity and jeopardy elements present questions of law, while the causation and overriding-justification elements present questions of fact. *Collins*, 73 Ohio St. 3d at 70.

Defendant argues that plaintiff cannot meet the clarity and jeopardy elements. As for the clarity element, defendant maintains that courts hold that the claimed policy (here, 14

11

C.F.R. § 121.135) must parallel the Ohio whistleblower statute. Defendant points to the Sixth Circuit's finding:

> Ohio courts require that a plaintiff's claimed policy parallel Ohio's whistleblower statute, Ohio Revised Code § 4113.52. To parallel that statute, the policy on which the plaintiff relies must (1) impose an affirmative duty on the employee to report a violation, (2) specifically prohibit employers from retaliating against employees who had filed complaints, or (3) protect the public's health and safety.

*Hale v. Mercy Health Partners,* 617 Fed.Appx. 395 (6th Cir. 2015) (internal quotation marks omitted). Likewise, defendant notes that a court in the Northern District of Ohio stated:

> Others courts, including the Ohio Supreme Court, while not expressly limiting statute-based *Greeley* claims to those paralleling the whistleblower statute, have in effect permitted such claims only where the statute includes a duty to report, retaliation protection, or conduct affecting the public or employee health and safety.

*Crowley v. St. Rita's Medical Center*, 931 F.Supp.2d 824 (N.D.Ohio 2013). Plaintiff argues that *Hale* was wrongly decided or is not controlling law. But, *Hale* is a recent Sixth Circuit decision addressing a claim for wrongful termination in violation of Ohio public policy. Accordingly, to satisfy the clarity element, the Court must find that 14 C.F.R. § 121.135 imposes a duty to report a violation, provides protection from retaliation for filing a complaint, or protects the public's health and safety. The Court agrees with defendant that the regulation does not meet any of those requisites. In general, the regulation states that the aircraft manual must include instructions and information to allow personnel to perform their duties, be in a form easy to revise, have the date of the last revision, and be not contrary to federal regulation. It also lists what information is required to be included in the manual, and states that a copy of the manual must be maintained at the base of operations. The regulation does not require that certificate holders report violations of the regulation, nor does it specifically prohibit employer retaliation. Finally, while the regulation impacts the public's safety, it clearly does not specifically protect

12

public health and safety.

For these reasons, plaintiff is unable to satisfy the clarity element and summary judgment is warranted on this basis.

Even assuming the clarity element had been met, the Court agrees with defendant that the jeopardy element cannot be satisfied either. Courts apply a three-part test for determining whether a plaintiff has satisfied the jeopardy element: (1) The court determines what kind of conduct is necessary to further the public policy at issue. (2) The court decides whether the employee's actual conduct fell within the scope of conduct protected by this policy. (3) The court considers whether employees would be discouraged from engaging in similar future conduct by the threat of dismissal. *Hale*, 617 Fed.Appx. at 403. (citations omitted). Again, plaintiff asserts that the law relied upon by defendant to support the three-part test is inapplicable. But, plaintiff does not identify what law is applicable in her discussion of this element. For the following reasons, plaintiff's arguments do not satisfy the jeopardy element.

Plaintiff asserts that the jeopardy element is satisfied because she made several complaints about Callahan's actions which resulted in unsafe AOMs, i.e., Callahan approved the use of the manuals even though they had black streaks and Callahan refused to credit plaintiff's method regarding the Change Bar issue in the FrameMaker software.

In *Himmell v. Ford Motor Co.,* 342 F.3d 593 (2003), the Sixth Circuit addressed the jeopardy element and demonstrated how this element is satisfied. There, it was undisputed that a section of the Labor Management Relations Act, which made it unlawful for employers to bribe union representatives, stated a clear public policy. Applying the three-part test for determining jeopardy, the court found that 1) employee reporting of complaints of conduct thought to violate

13

that section is necessary to further the purpose of section, 2) the plaintiff's conduct in making complaints about defendant's preferential treatment concerning union representatives implicated the potential corruption of union-employer relationships and, thus, fell within the scope of the public policy at issue, and 3) permitting the defendant to terminate the plaintiff in retaliation for his complaints about the potential corruption would discourage other employees from doing so.

Here, plaintiff cannot satisfy the three-part test.  As to the first element, assuming there was a clear public policy stated in 14 C.F.R.§ 121.135, the Court would have to determine what kind of conduct is necessary to further the policy.  Plaintiff asserts that it is the conduct of reporting safety issues affecting the manuals.  Assuming this to be true, the Court does not find the second element to be met, i.e., that plaintiff's actual conduct fell within the scope of conduct protected by the policy.

Plaintiff maintains that her complaints were made in good faith to protect the public from an airline crash. The evidence does not support this position. As discussed below, plaintiff's December 14, December 19, and January 19 emails do not report a safety issue involving the black streaks or the Change Bars, but only reiterate plaintiff's longstanding complaints about Callahan. Plaintiff's deposition testimony and her emails show that beginning shortly after Callahan became her supervisor, plaintiff complained verbally and then in writing about what she considered to be Callahan's incompetence.  Even without the declaration testimony of plaintiff's co-workers which relate to plaintiff's constant negative talk regarding Callahan, which plaintiff disputes, plaintiff's own emails show that she repeatedly undermined, questioned, and disrespected her supervisor. Her insubordination is clearly demonstrated by the email exchange in November 2016 wherein plaintiff refused to follow the quality control measure being

instituted by Callahan. Plaintiff's emails show that she did not trust Callahan, she considered Callahan to be "competitive" with her, she felt Callahan did not train the department employees, she believed Callahan "messed up" files due to her lack of knowledge, and Callahan took credit for the other department employees' work. The December 14, December 19, and January 19 emails are only further evidence of these complaints. Plaintiff's own deposition testimony shows that she believed Callahan tried to make the Tech Pubs employees look bad so that Callahan would look better and that her lack of knowledge messed up the files.

Even accepting that the "black streaks" discussed in the December 14 and 19 emails presented a safety issue that needed to be reported, plaintiff testified that she had only printed three pages of the manual before the printer was fixed. Nor is there evidence that the Change Bar issue discussed in the December 14 and January 19 emails presented a safety concern. Plaintiff merely presents her own self-serving statements that her "way of doing things" was superior to the method preferred by her supervisor and the other Tech Pubs employees. Having failed to demonstrate that the first two elements have been met, the Court need not reach the third element. Plaintiff simply does not satisfy the three-part test of the jeopardy element.

Assuming the clarity and jeopardy elements have been met, the Court proceeds to the final two requisites of a public policy claim. The Sixth Circuit stated in *McDermott v. Continental Airlines, Inc.,* 339 Fed.Appx. 552 (6th Cir. 2009), that to establish causation and that defendant lacked an overriding business justification, courts apply the *McDonnell Douglas* burden-shifting framework. "To make out such a case, [plaintiff] must show a causal link between the safety complaints and [her] discharge, then [defendant] must offer a legitimate nondiscriminatory reason for the termination, after which [plaintiff] must show that the proffered

15

reason is pretextual." *Id.* at 555. While plaintiff disputes the applicability of this law, she does not propose an alternative. The Court will follow the Sixth Circuit precedent.

As to causation, plaintiff asserts that she was terminated in retaliation for making safety complaints involving Callahan in her December 14, December 19, and January 19 emails. However, the six page December 14 email does not raise a safety issue, but only questions Callahan's qualifications and alleges that she was competitive with the other employees in the department. Plaintiff cites the "black streaks" and Change Bar incidents as "examples" of Callahan's competitiveness. Plaintiff again raises the issue of the "black streaks" in the December 19 email, but she admitted that she did not print the manuals in that condition because the printer was repaired. Finally, the January 19 email only related that plaintiff had found a method regarding Change Bars in the FrameMaker software which the other members of the department had chosen not to follow. There is no issue of fact as to causation.

Defendant has offered a non-discriminatory reason for plaintiff's termination, i.e., Prince terminated plaintiff for her insubordination towards Callahan. Plaintiff fails to show pretext. As stated above, plaintiff's insubordination is well-documented by plaintiff's own emails and substantiated by the declarations of her co-workers. Ultimately, the January 11 Record of Instruction and Action warned plaintiff that she could be terminated for making disparaging remarks about Callahan or for not following her instructions. Plaintiff's January 19 email shows that plaintiff did not want to follow Callahan's "requested way" of addressing Change Bars and she complains that Callahan ignored her method. Even assuming this email is not evidence of plaintiff's failure to follow Callahan's instructions, Prince learned on January 30 that plaintiff was denigrating Callahan to Monyak, who had no relation to the Tech Pubs department. Plaintiff

avers that Monyak's email is false, but this is merely a self-serving statement that is belied by plaintiff's own emails and deposition testimony. In particular, Monyak stated that plaintiff told her that she has 30 years more experience than Callahan and that Callahan did not train her properly. As discussed above, plaintiff's emails repeatedly addressed the lack of training and the fact that she and the other Tech Pubs employees had 20 more years of experience than Callahan. Plaintiff also testified at deposition as to Callahan's "lack of knowledge."[1]

Once Prince learned that plaintiff was talking to Monyak about Callahan, Prince asked Nenadovic if plaintiff's behavior was continuing and she learned that it was. Nenadovic stated in his declaration that he told Prince that within the past few weeks the intensity of plaintiff's negative comments towards Callahan had increased. He wrote an email stating the same. Plaintiff disputes Nenadovic's statements, but again many of his statements are confirmed by plaintiff's own emails and deposition testimony. For instance, Nenadovic stated in his email that plaintiff told him that Callahan bugged the area, tried to corrupt the files, took credit for the employees' work so that she could look better, gave them misinformation, and had no experience. Plaintiff's own emails and deposition testimony show that she did not trust Callahan and she believed that Callahan "messed up" their files, Callahan did not give credit for their work, Callahan wanted to make herself look better, Callahan gave them inaccurate files and information which caused extra work, and Callahan lacked knowledge and experience.

Additionally, plaintiff tries to undermine the credibility of Nenadovic's declaration

---

[1] In fact, Daniels's contemporaneous handwritten notes from the January 5 meeting with plaintiff and Prince indicate that plaintiff stated she had 20 years more experience than Callahan.

17

testimony by presenting a December 2016 email he wrote effusively thanking plaintiff for helping him with a software issue. However, this simply fails to raise an issue of material fact as to the veracity of Nenadovic's declaration testimony and his February 1, 2017 email given that plaintiff's own emails and testimony corroborate the issues he raises. Finally, plaintiff asserts that Nenadovic's February 1 email was created after she was orally informed of her termination and, therefore, casts suspicions on defendant's motivations. The Court has evidence that plaintiff was notified in writing on February 1 that she was being terminated. Even assuming she was orally notified earlier in that day, the evidence shows that Prince spoke with Nenadovic and Monyak on January 30.

Likewise, the fact that plaintiff received a positive performance review in October 2016 does not contradict the evidence of plaintiff's insubordination- much of it occurring after the performance review. Finally, plaintiff attempts to raise an issue of fact as to the reason for her termination by arguing that Callahan was retaliating against her. But, Callahan did not make the decision to terminate plaintiff. Moreover, plaintiff responded to the Record of Instruction and Action by stating that she believed the discipline was issued in retaliation for accusing Callahan of "neglect of duty." She did not state that the discipline was a result of reporting Callahan's safety violations. For these reasons, plaintiff fails to show that defendant's non-discriminatory reasons for her termination were pretextual.

As there is no issue of fact as to the public policy claim, defendant is entitled to summary judgment.

**Conclusion**

For the foregoing reasons, defendant's Motion for Summary Judgment is granted.

IT IS SO ORDERED.

 /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Court
Chief Judge

Dated: 10/9/18